**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

PCT International Incorporated,

               Plaintiff,

v.

Holland Electronics LLC,

               Defendant.

No. CV-12-01797-PHX-JAT

**ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pending before the Court are the following motions:

(1)     "Defendant's Motion to Supplement the Record" (Doc. 396)

(2)     "Defendant's Motion for Entry of Judgement [sic], Findings of Fact, and Conclusions of Law Regarding Laches and Equitable Estoppel" (Doc. 406)

(3)     "Defendant's Renewed Motion for Judgment as a Matter of Law Regarding the Number of Infringing Units and Amount of Damages; (2) Infringement; (3) Invalidity for Anticipation or Obviousness; (4) Invalidity for Indefiniteness, and (5) Extraterritoriality" (Doc. 408; Doc. 409-1)

(4)     "Plaintiff PCT International, Inc.'s Motion for an Accounting for Royalties Due Through Entry of Judgment, Prejudgment Interest, and Postjudgment Interest" (Doc. 405)

(5)     "Plaintiff PCT International, Inc.'s Motion for Permanent Injunction" (Doc. 404)

The Court now rules on the motions.

## I.   Background

The parties are thoroughly familiar with the basic facts of this case, and the Court will not repeat them here. During the jury trial, Defendant Holland Electronics LLC ("Holland") filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Rule") 50. (Doc. 381). While this motion was pending, the jury returned a verdict in favor of Plaintiff PCT International, Inc. ("PCT"). (Doc. 394). Specifically, the jury found that Holland directly (but not willfully) infringed claim 1 of United States Patent No. 6,042,422 (the "'422 Patent") with respect to sixty Holland products. (*Id.* at 2-5). The jury also found that the '422 Patent was not invalid, and awarded PCT damages of $515,778.27 covering a royalty payment for 14,736,522 infringing units. (*Id.* at 5-6).

Following the conclusion of trial, the Court held a status conference where the parties and Court agreed that the Court would deny Holland's motion for judgment as a matter of law without prejudice to Holland filing a renewed motion; that the parties would file all post-trial motions by June 5, 2015; and the Court would not enter judgment until after ruling on the post-trial motions. (Doc. 401). The parties have now filed their post-trial motions.

## II.   Motion to Supplement the Record

Holland has filed a motion to supplement the record with a copy of a proposed jury instruction that Holland handed to the Court during trial but neither filed nor read aloud into the transcript. (Doc. 396). PCT has not filed a response to the motion; moreover, this proposed jury instruction is properly part of the record. Therefore, the Court will grant the motion. The proposed instructions now filed at Docs. 396-1 and 396-2 are part of the record.

## III.   Laches and Equitable Estoppel

Holland moves for entry of judgment in its favor on its affirmative defenses of laches and equitable estoppel, both of which Holland alleged in its "First Amended Answer to Complaint." (Doc. 51 at 15-16). As these are equitable defenses not tried to

the jury, the Court must issue findings of fact and conclusions of law.

### A.    Findings of Fact[1]

In September 2007, Holland first began selling products that PCT accuses of violating the '422 Patent. (Tr. 1069:25-1070:1). Holland did not market or advertise its allegedly infringing[2] connectors in a 2007 catalog or on its website in 2007, however. Between September 2007 and October 2010, Holland sold approximately 15 million allegedly infringing connectors. (Tr. 1060:16-17, 1061:2-5). Holland did not sell its allegedly infringing connectors in large quantities to the cable and satellite markets in the United States; rather, it sold only small quantities to the industrial and home markets. (Ex. PX561 at 0002; Tr. 1464). Most of Holland's sales of these connectors, at least through 2012, were to Latin America. (Ex. PX561 at 0002; Tr. 1464).

PCT at least periodically monitored its competitors' products to check whether competitors were infringing PCT's patents. (Tr. 827-32, 905:13-15). Nevertheless, PCT did not have actual or constructive knowledge of Holland's alleged infringing activities until October 2010. In approximately October 2010, PCT became aware of a 2010 Holland catalog that listed connectors which PCT believed could infringe its patents. (Tr. 833:12-18; Ex. 1141; Ex. 1143). On October 12, 2010, PCT's general counsel sent Holland a letter informing Holland that PCT believed features of Holland's connectors were "very similar to those disclosed" in the '422 Patent and seeking to discuss the matter with Holland. (Ex. PX031). After PCT and Holland exchanged e-mails in October and November 2010, (Ex. 1143), PCT did not contact Holland regarding the alleged infringement of the '422 Patent until April 2012, when PCT's outside counsel sent a letter to Holland accusing Holland of infringing the '422 Patent. (Ex. PX033; Tr. 1210:10-15).

---

[1] The Court states only those facts necessary to decide the laches and equitable estoppel issues.

[2] The Court uses the term "allegedly infringing" because although the jury found Holland to have sold sixty infringing products, the cited testimony appears to refer to all sixty-four allegedly infringing Holland products. For purposes of deciding the laches issue, this difference does not appear relevant to the Court's analysis.

In 2011, the International Trade Commission embargoed certain Holland connectors, including those designs immediately predating the designs at issue in this infringement action, from entering the United States. (Tr. 1513, 1580-81). Although this embargo, which was eventually lifted, limited Holland's imports of the allegedly infringing connectors, some imports still occurred and Holland also maintained an inventory within the United States that it used to fulfill orders. (Tr. 1513-14).

In December 2011, PCT employees discussed among themselves a new Holland SLCU-6 connector that was hitting the Latin American market and "someday possibly the US," with one PCT sales manager thinking the connector would not make inroads into the U.S. market. (Ex. DX1006).

On April 9, 2012, PCT sent Holland a letter again accusing Holland of infringing the '422 Patent and requesting that Holland discuss licensing possibilities to use the '422 Patent. (Ex. PX33). PCT filed the present lawsuit against Holland on August 21, 2012. (Doc. 1). Between October 2010 and August 2012, Holland sold approximately 4 million allegedly infringing connectors. (Tr. 1060:22-23).

## B.     Analysis & Conclusions of Law

### 1.     Laches

Holland argues that the doctrine of laches is an equitable defense to PCT's claim for infringement of the '422 Patent. (Doc. 406 at 4). Specifically, Holland contends that PCT delayed for an unreasonable and inexcusable length of time in filing suit against Holland after PCT first knew or should have known of Holland's alleged infringement, and this delay has prejudiced Holland. (Doc. 406 at 5-6).

#### a.     Legal Standard

Laches is an equitable and affirmative defense to a claim of patent infringement. Fed. R. Civ. P. 8(c)(1); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). The Federal Circuit Court of Appeals ("Federal Circuit") has defined laches as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the

adverse party and operates as an equitable bar." *Aukerman*, 960 F.2d at 1028-29. A defendant invoking the laches defense must prove by a preponderance of the evidence that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant" and (2) "the delay operated to the prejudice or injury of the defendant." *Id.* at 1032, 1045.

The Federal Circuit has held that the period of the plaintiff's delay "begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities." *Wanless v. Gen. Elec. Co.*, 148 F.3d 1134, 1337 (Fed. Cir. 1998). Even when a plaintiff has actual ignorance of the defendant's activities, "ignorance will not insulate him from constructive knowledge of infringement" when the defendant engages in "pervasive, open, and notorious activities that a reasonable patentee would suspect were infringing." *Id.* at 1338 (internal quotation marks omitted). "For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Id.* Constructive knowledge also may exist when these activities "are sufficiently prevalent in the inventor's field of endeavor." *Id.*

The length of delay between the date on which the plaintiff acquires actual or constructive knowledge of the defendant's alleged infringing activities and the date on which the plaintiff files the infringement suit "which may be deemed reasonable has no fixed boundaries but rather depends on the circumstances." *Aukerman*, 960 F.2d at 1032. In determining whether the plaintiff's delay is inexcusable, courts have considered factors such as other litigation, negotiations with the accused, poverty and illness, the extent of infringement, and dispute over ownership of the patent. *Id.* at 1033.

The defendant may satisfy the second prong of the laches defense, prejudice, by showing either evidentiary or economic prejudice resulting from the plaintiff's delay. *Id.* Evidentiary prejudice arises "by reason of a defendant's inability to present a full and fair

- 5 -

defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.* Economic prejudice arises when the defendant (or others) "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit," but does not include merely those damages "attributable to a finding of liability for infringement." *Id.* Rather, the defendant must show a change in its economic position during the period of delay. *Id.*

### b.    Analysis

The starting point in deciding whether PCT's delay in filing suit was unreasonable and inexcusable is to determine the period of delay at issue. The parties dispute whether this period began in 2007 or in October 2010. Holland contends PCT's period of delay began in 2007, when Holland introduced the allegedly infringing products. (Doc. 406 at 5). PCT contends that the period of delay began in October 2010 when PCT became aware of Holland's alleged infringement and when Holland first marketed the products in its catalog. (Doc. 422 at 2-3).

Holland asserts that PCT had constructive notice in 2007 of its allegedly infringing products because Holland openly and notoriously sold these products, made them available on the market (including for retail purchase), and described them in its catalog. (Doc. 406 at 5). Although Holland cites three pieces of evidence in support of its argument, none of this evidence establishes PCT's constructive knowledge in 2007 of Holland's sales. First, Holland relies upon its "publicly available product catalog and website" as evidence that PCT had a duty to investigate whether Holland's products infringed the '422 Patent. (Doc. 406 at 1; Doc. 428 at 2). The only product catalog cited by Holland or discussed at trial bears a copyright date of 2010 and therefore is not probative as to Holland's catalog in 2007.[3] *See* (Ex. PX333 at 116).

---

[3] Holland also argues that because PCT's expert testified that "he could determine infringement by looking at the catalog," the catalog gives rise to constructive knowledge on the part of PCT. (Doc. 428 at 2). There are two problems with this argument. First, PCT's expert did not testify that he could determine infringement by looking at the catalog; rather, he testified that he *had looked* at Holland's catalog in addition to other

Second, Holland cites the trial testimony of Michael Holland, who testified that the Holland website contained cutaway drawings of its connectors showing their inside design. (Doc. 406 at 1:15-16; Tr. 1204:16-21). Mr. Holland also testified that Holland products were "available on the market at that time," including in retail stores. (Tr. 1204:22-1205:9). However, Mr. Holland made these comments in the context of a discussion concerning his October 18, 2010 e-mail to PCT's general counsel. *See* (Tr. 1204:1-24; Ex. 1143). As such, his testimony is contextually limited to that timeframe.[4]

Third, Holland cites the testimony of Brandon Wilson and Steve Youtsey, who testified that PCT at least periodically monitored its competitors' products to ensure that competitors were not infringing PCT's patents and PCT was aware that Holland made product information available on Holland's website. (Doc. 406 at 1) (citing Tr. 827-32); *see also* (Tr. 905:13-15) (testimony of Steve Youtsey that the coaxial cable connector market is like a "small town where everybody kind of knows everybody's business"). Holland argues that because Steve Youtsey and Brandon Wilson did not temporally limit their "admissions," their testimony applies to the period beginning in 2007. (Doc. 428 at 1-2). But Holland has not presented evidence that it advertised its allegedly infringing connectors in its 2007 catalog or on its website in 2007. Therefore, Holland has not shown that PCT had actual knowledge of Holland's allegedly infringing activities prior to October 2010. Nor has Holland shown that it engaged in "pervasive, open, and notorious activities" prior to October 2010 such that PCT had constructive knowledge of these activities.

Because Holland has not shown by a preponderance of the evidence that PCT had

---

materials when he reached his opinion on the issue of infringement. (Tr. 565:5-566:11). Second, even if this testimony had been as Holland now depicts it to be, PCT's expert reviewed the 2010 catalog, not a 2007 catalog. (Tr. 566:4-7). Thus, nothing in this testimony supports a finding that PCT had constructive knowledge of Holland's alleged infringing activities in 2007.

[4] Holland contends that "Mr. Holland did *not* testify that Holland's products were available at retail locations only in 2010." (Doc. 428 at 2). Holland is correct. Mr. Holland merely testified that as of October 2010, Holland products were available at retail locations. (Tr. 1024:1-3, 1024:22-1025:1; Ex. 1143). But neither did Mr. Holland testify that Holland's products were available at retail locations during years *other* than 2010. Holland's contention is without merit.

actual or constructive knowledge of Holland's allegedly infringing activities prior to October 2010, the Court finds, as it has stated in its findings of fact, that the period of PCT's delay in filing suit begins in October 2010.

The Court now turns to the issue of whether PCT's delay from October 2010 to its filing suit on August 21, 2012 was unreasonable and inexcusable. PCT asserts that its delay was reasonable because (1) Holland's 2010 catalog did not show the shape of Holland's "grip ring" in sufficient detail to determine, from the catalog alone, whether Holland's connectors infringed the '422 Patent; (2) PCT believed Holland's sales to be focused in Latin America and not the United States; and (3) Holland's infringing connectors were the subject of an embargo that prevented their importation into the United States. (Doc. 422 at 7).

PCT's contention that its delay was reasonable because Holland's 2010 catalog did not sufficiently show the details of Holland's connectors is unpersuasive. By October 2010, PCT evidently believed that Holland's connectors might infringe the '422 Patent. PCT considered the possibility of infringement to be sufficient to merit contacting Holland and inviting Holland to discuss the matter further. The fact that it was not clear from Holland's catalog alone as to whether Holland was infringing the '422 Patent does not negate PCT's awareness of the potential infringement.

Holland argues that PCT's delay was unreasonable because PCT knew that Holland was selling a large volume of allegedly infringing connectors in the United States. (Doc. 428 at 3). But Holland has not shown that PCT was aware of significant sales of the allegedly infringing connectors and chose to sit on its rights. Rather, the evidence shows that Holland's connectors were mostly sold to Latin America, not the United States, and when Holland was importing them into the United States in 2011, this importation was limited. Even if Holland's 2011 importation was sufficient to trigger PCT's duty to commence an infringement proceeding against Holland, it was not unreasonable for PCT to spend a year to conduct testing of Holland's products, prepare for litigation, attempt to settle the dispute, or engage in any other pre-litigation practices.

Holland contends that because courts have applied laches "based on delays as short as five months," the Court should find PCT's delay to be unreasonable and inexcusable. (Doc. 428 at 4). In *Romag Fasteners, Inc. v. Fossil, Inc.*, 29 F. Supp. 3d 85 (D. Conn. 2014), upon which Holland principally relies, the court found the plaintiff in a patent infringement suit to have unreasonably and inexcusably delayed filing suit where the plaintiff had had in its possession all of the necessary information to determine infringement five months before it filed suit. 29 F. Supp. 3d at 99-100. There, the court noted that the nature of the defendant's business—designer handbags—coupled with the November timing when the plaintiff filed suit led to the "inescapable conclusion . . . that Plaintiff carefully timed this suit to take advantage of the imminent holiday shopping season to be able to exercise the most leverage over Defendants in an attempt to extract a quick and profitable settlement, as it had done twice before in the past three years." *Id.* at 100.

Unlike in *Romag Fasteners*, there is no evidence PCT purposefully delayed filing suit for the purposes of extracting a profitable settlement from Holland or for furthering Holland's infringement with an eye toward a greater recovery of damages. Although Holland contends that PCT timed its pre-litigation letter and the filing of its complaint to seek to pressure Holland during acquisition negotiations, (Doc. 428 at 4-5), the evidence at trial showed that PCT had no knowledge of these negotiations and the parties involved in these negotiations had signed non-disclosure agreements. (Tr. 987:11-24). The facts of the present case do not resemble those in *Romag Fasteners*.

Holland fails to prove by a preponderance of the evidence that PCT's delay in filing suit from October 2010 to August 21, 2012 was not unreasonable and inexcusable.[5]

---

[5] The Court has not addressed Holland's rebuttals to PCT's arguments concerning allegedly misleading statements by Holland regarding the shape of Holland's connectors. *See* (Doc. 428 at 5) (citing Doc. 422 at 5-6). Because Holland's statements to PCT described legal reasons why Holland believed its connectors to not infringe the '422 Patent, they could not have misled PCT from discovering the true physical characteristics of Holland's connectors. *See* (Ex. DX1339, DX1143). It is common sense that, except in unusual circumstances, an accused infringer's disagreement as to whether the features of its products infringe the patentee's patent cannot by itself mislead the patentee into believing that no infringement has occurred.

Although the four million units that Holland sold within the United States during this timeframe sounds significant in hindsight, there is no evidence that PCT acted unreasonably or inexcusably in not immediately filing suit upon suspecting infringement in October 2010. In the absence of evidence, Holland essentially asks the Court to infer impropriety from the mere length of PCT's delay alone, which is the kind of "mechanical rule[]" that the Federal Circuit has disavowed in applying the equitable defense of laches. *See Aukerman*, 960 F.2d at 1032 ("A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties."). Accordingly, PCT's delay was not unreasonable and inexcusable, and laches does not apply.[6]

### 2.      Equitable Estoppel

Holland argues that equitable estoppel bars PCT's claim for infringement because PCT misled Holland into believing that PCT would not enforce the '422 Patent against Holland and Holland relied upon PCT's conduct. (Doc. 406 at 7-8).

### a.      Legal Standard

Equitable estoppel, like laches, is an equitable defense to patent infringement that may bar the plaintiff from all relief on its infringement claim. *Aukerman*, 960 F.2d at 1041. Unlike laches, however, equitable estoppel is not about the reasonableness of the plaintiff's delay in filing suit; rather, equitable estoppel concerns the plaintiff's misleading conduct. *See id.* at 1042.

To prove equitable estoppel, an alleged infringer must establish three elements by a preponderance of the evidence. *Id.* at 1028, 1046. First, the alleged infringer must show that "[t]he patentee, through misleading conduct, [led] the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer." *Id.* at 1028. "'Conduct' may include specific statements, action, inaction, or silence where there was an obligation to speak." *Id.* This element requires that the alleged infringer is aware of the patentee and the patent, and the alleged infringer "must know or

---

[6] Because the Court concludes that Holland has not proved the first prong of the laches analysis, the Court need not address the parties' arguments concerning the second prong, material prejudice to Holland.

reasonably be able to infer that the patentee has known of the former's activities for some time." *Id.* at 1042.

Second, the alleged infringer must show that it relied on the patentee's conduct. *Id.* at 1028. This requires the alleged infringer to "show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action." *Id.* at 1042-43.

Third, the alleged infringer must show that because of its reliance upon the patentee's conduct, "the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Id.* at 1028, 1043.

### b. Analysis

With respect to the second element of equitable estoppel, Holland argues that it relied upon PCT's misleading conduct because if PCT had filed suit earlier against Holland, Holland would have redesigned its products and discontinued its sales of the allegedly infringing products. (Doc. 406 at 8-9). Holland correctly cites *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305 (Fed. Cir. 2010) for the proposition that a defendant may establish reliance by showing that it would have discontinued its sales of the allegedly infringing products had the plaintiff filed its infringement suit at an earlier time. *See Aspex*, 605 F.3d at 1312; (Doc. 406 at 8). The fatal flaw in Holland's argument is that no evidence in the record supports Holland's assertion that it would have discontinued sales of the allegedly infringing products if PCT had filed its suit at an earlier time. Holland's assertion in its motion is the argument of counsel, not evidence.

To the contrary, affirmative evidence exists from which the Court infers that Holland would not have discontinued its sales of the allegedly infringing products if PCT had sued earlier. PCT filed the present lawsuit on August 21, 2012. (Doc. 1). The Court issued its *Markman* claim construction order on February 21, 2014. (Doc. 124). Despite both of these events, Holland continued to infringe until at least February 25, 2015. (Tr. 1060:2-6). Holland's continued sales of its infringing products even after it was sued and had lost its claim construction arguments undermines Holland's claim of reliance upon

any PCT misconduct.

Because Holland has not shown any evidence of reliance, it has not satisfied its burden of proving the second prong of equitable estoppel. Accordingly, Holland has failed to prove equitable estoppel.[7]

## IV.    Motion for Judgment as a Matter of Law

Holland moves for judgment as a matter of law pursuant to Rule 50 on five issues: (1) literal infringement of the "annular rib" requirement; (2) invalidity; (3) indefiniteness; (4) extraterritoriality; and (5) the number of infringing units. (Doc. 408).

### A.    Rule 50 Standard

Rule 50 permits a court to grant judgment as a matter of law ("JMOL") on an issue if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (quoting *Ostad v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003)). The court must uphold the jury's verdict "if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "In making this determination, the court must not weigh the evidence, but should simply ask whether the [moving party] has presented sufficient evidence to support the jury's conclusion." *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008). The court must "view the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw all reasonable inferences in [its] favor." *Lakeside-Scott*, 556 F.3d at 802.

---

[7] Consequently, the Court need not address the first or third prongs of equitable estoppel.

**B.      Literal Infringement of the "Annular Rib" Requirement**

**1.       The Meaning of "Annular Rib"**

Holland argues that no reasonable juror could have found that its products literally infringed the "annular rib" requirement of the '422 Patent. (Doc. 408 at 3). Claim 1 of the '422 Patent requires that the collapsible band "form[s] an annular rib projecting inward . . . when said outer barrel is axially compressed." Holland contends that "annular" means "basically circular" and the evidence showed Holland's connectors form a square shape. (*Id.* at 5). Neither party sought the Court's construction of the term "annular rib" during the *Markman* briefing or at the *Markman* hearing. Because Holland suggested a proposed construction of "annular rib" to the jury during trial, PCT argued that Holland was improperly presenting claim construction evidence to the jury. (Doc. 351); *see also* (Doc. 276) (motion in limine). The Court declined to construe "annular rib" in its jury instructions, instead concluding that the term should be given its plain and ordinary meeting. (Tr. 1976-77; Doc. 393 at 17).

The Court reiterates that Holland's untimely claim construction argument concerning "annular rib" is improper, and the Court again declines Holland's invitation to construe the term. Nor does "annular rib" need to be construed even if Holland's argument was timely; the term "annular rib" as used in claim 1 of the '422 Patent has its plain and ordinary meaning.[8]

Nothing in the specification or prosecution history of the '422 Patent suggests a particular meaning for "annular ring" that would vary from its ordinary meaning. *See* (Doc. 124 at 1-4) (claim construction legal standard). One dictionary definition for "annular" is "of, relating to, or forming a ring." *See* Merriam-Webster, Inc., *Annular*, http://www.merriam-webster.com/dictionary/annular (last visited Aug. 4, 2015). Thus, an annular rib is a rib relating to or forming a ring around the longitudinal axis of the connector. Holland argues that this rib must be circular, citing both PCT's expert and

---

[8] The Court agrees with Holland that the meaning of a claim term is for the Court to decide. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975-76 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

*John Mezzalingua Associates Inc. v. Cabel-Con, Inc.*, 1997 WL 176318 (N.D.N.Y. Apr. 7, 1997) (Doc. 408 at 5). In *John Mezzalingua*, the court construed the word "circular" as not requiring the "exact form of a circle" but also not extending to any object that "has a continuous edge around it," such as a square. 1997 WL 176318, at *4. The Court agrees that the term "circular" as used to describe an object does not require a mathematically precise circle but only that the object approximately form a circle. Furthermore, the Court agrees that the term "annular" means "circular." Annular means "ring-shaped," and rings are ordinarily understood to have circular shapes. Thus, the term "annular rib" as used in the '422 Patent has the plain and ordinary meaning that the rib is ring-shaped, forming at least an approximate circle around the longitudinal axis of the connector. *Accord Monroe Eng'g Prods., Inc. v. J.W. Winco, Inc.*, 915 F. Supp. 901, 906 (E.D. Mich. 1996), *rev'd on other grounds*, 121 F.3d 728 (Fed. Cir. 1997) (construing the term "annular" as requiring an element to be "circular or ring-like in shape, but not necessarily a perfect circle").

### 2.     Substantial Evidence

Because Holland moves for JMOL on the issue of infringement, the Court must examine whether there was substantial evidence supporting the jury's finding that Holland's connectors met the annular rib limitation of claim 1 of the '422 Patent. Holland argues that no reasonable jury could have found Holland's accused products formed an annular rib when axially compressed because the only evidence presented at trial showed that the compression ring in Holland's connectors formed a square—not circular—shape. (Doc. 408 at 5).

Holland is correct that PCT's own test report, admitted at trial, showed that when an accused Holland connector was axially compressed, the compression ring inside the connector formed a shape that resembled a square. PCT called the shape of Holland's compressed compression ring a "rectangular form, instead of a circular form." (Ex. DX1005). PCT's photographs of a compressed Holland SLCU-6 connector show a compression ring that projects unevenly around the longitudinal axis of the connector. (*Id.*) In the photos, the compression ring forms an approximate square, with minimal

projection toward the longitudinal axis of the connector in the four corners of the square. (*Id.*)

Two problems exist with Holland's contention that the square shape of Holland's compression ring precludes a finding of infringement. First, because the annular ring does not need to be a perfect circle, Holland's compression ring, which forms a ring completely around the longitudinal axis of the connector, could be annular in nature. Evidence existed from which the jury could conclude that even a compression ring resembling a square could meet the definition of "annular rib." For example, the photos in PCT's test report show that even in the corners of the "square," the compression ring still projects inward toward the longitudinal axis of the connector. *See* (Ex. DX1005). Thus, there was evidence that Holland's compression ring projected inward in a complete 360-degree circle around the longitudinal axis of the connector, although the depth of these projections varied at different points around this circle.

Dr. Whittle, Holland's expert witness, testified on cross-examination that an annular rib did not need to be a perfect circle and that claim 1 of the '422 Patent did not require symmetry around the circumference of the outer barrel. (Tr. 1713-14). Dr. Whittle also testified that an annular rib would have "an annular series of projections in a ring." (Tr. 1714). Thus, although Dr. Whittle also testified that Holland's connectors did not meet the annular rib claim limitation because the compression ring formed "cracks and gaps" at four corners, (Tr. 1688-89), a reasonable jury could have weighed the evidence and concluded that the shape of Holland's compression ring satisfied the annular rib limitation of claim 1 of the '422 Patent.

Second, substantial evidence existed from which a reasonable jury could conclude that the square shape of Holland's compressed compression ring was not representative of the in-field operation of Holland's connectors. During Holland's cross-examination of PCT's expert witness Dr. Dickens, Dr. Dickens testified that PCT tested Holland's SLCU-6 connector without inserting a coaxial cable into the connector. (Tr. 694:1-6). Dr. Dickens testified that axially compressing a Holland connector without a coaxial cable

inserted into the connector could alter the geometry of the compression ring, stating that "[y]ou may get different points when – without the cable in there on some of the bigger connectors, you may have more points without the cable in there." (Tr. 695:19-22); *see also* (Tr. 696:10, 696:15-20). After Holland's counsel led Dr. Dickens through extensive discussion of a hypothetical, (Tr. 696-704), Dr. Dickens opined that "I've seen it embed into the cable, and so it has – it's not a square shape like your drawing." (Tr. 706:9-11). Dr. Dickens opined that the Holland connectors behave differently when a cable is inserted during axial compression, and that he disagreed with PCT's test report as reflecting the operation of Holland connectors when compressed onto cables, (Tr. 707:2-6).

A reasonable jury could infer from Dr. Dickens' testimony that axially compressing a Holland connector without having a cable inserted into the connector is not representative of how Holland connectors perform when compressed onto coaxial cables. Therefore, even assuming that the allegedly square shape of the Holland connectors did not constitute an annular rib, a reasonable jury could have found that the Holland connectors in fact formed an annular rib satisfying claim 1 of the '422 Patent when used as claim 1 of the '422 Patent requires, namely used with a coaxial cable.

Holland attacks Dr. Dickens' testimony as unreliable and an improper basis for the jury's verdict because Dr. Dickens testified that to reliably opine on infringement in this case, he would need to see more than one cross-section of an accused Holland connector. (Tr. 707:10-16). Holland contends that Dr. Dickens thus admitted his own opinion was unreliable because he based his infringement opinions on only one cross-section of each Holland connector. (Doc. 408 at 7-8). This contention is problematic for at least two reasons. First, because Dr. Dickens' admission followed intense questioning by Holland regarding particular photographs of a Holland connector, (Tr. 703-07), this context reasonably imparts a meaning upon Dr. Dickens' use of the word "cross-section" as referring to physical cross-sections of a connector.[9] But Dr. Dickens testified that he

---

[9] If a person is shown a single physical cross-section of a connector (sliced along

reviewed the engineering drawings for each of the accused Holland connectors. (Tr. 482:17-21, 525-26). These engineering drawings reflected the designs of the Holland connectors such that their cross-section views applied to *every* cross-section of the connectors that can be determined by a plane containing the longitudinal axis of the connector—not just one particular such cross-section. Second, Dr. Dickens testified that all of Holland's accused products shared the same shallow v-shaped outer barrel component. (Tr. 528-29). Thus, because (1) Dr. Dickens also reviewed physical samples for many of the connectors, (2) the connectors' engineering drawings indicated that all of the connector models shared the same v-shaped outer barrel component, and (3) Dr. Dickens identified the same v-shaped outer barrel component on the physical samples that was also present in the engineering drawings, Dr. Dickens relied upon multiple cross-sections in forming his infringement opinion. (Tr. 528). Accordingly, Dr. Dickens' expert opinion was sufficiently reliable to be admissible and support the jury's verdict.

Additionally, Holland implies that no reasonable jury could have found that Holland's products literally infringed the "annular rib" limitation of claim 1 of the '422 Patent because the Court failed to restrict the scope of its jury instructions regarding the doctrine of equivalence to exclude the "annular rib" limitation. (Doc. 408 at 9). The only limitation of claim 1 of the '422 Patent for which PCT offered evidence pertaining to the doctrine of equivalents was the "non-collapsible wall portion." (Tr. 1983). The Court instructed the jury generally on both literal infringement and infringement under the doctrine of equivalents, and did not specify in the doctrine-of-equivalents instruction to which claim terms it applied. (Doc. 393 at 19-20). The jury ultimately found that Holland "either literally or under the doctrine of equivalents" infringed claim 1 of the '422 Patent. (Doc. 394 at 2).

Holland asserts that the Court erred in not restricting the doctrine of equivalence to only the "non-collapsible wall portion" claim term. (Doc. 408 at 9). Holland's argument

---

its longitudinal axis), the presence of what *appeared* to be a cross-section of an annular ring would not be sufficient to conclude that a ring encircles the inner tube of the coaxial cable.

cannot possibly undermine the jury's verdict because even assuming Holland was correct, the jury's verdict contained a logical disjunction (". . . either . . . or . . ."). Because substantial evidence supported the jury's finding of literal infringement, substantial evidence must therefore support the jury's finding of *either* literal infringement *or* infringement under the doctrine of equivalents.

Finally, Holland also argues that prosecution history estoppel prevents a finding of literal infringement of claim 1 of the '422 Patent.[10] (Doc. 408 at 9-10). Holland asserts that the United States Patent and Trademark Office ("USPTO") allowed claim 1 of the '422 Patent only upon PCT's representation that the structure of its collapsible band permits the band to collapse without cracking. (Doc. 408 at 10). Thus, Holland claims, "PCT is estopped from expanding Claim 1 of the '422 Patent to cover connectors that leave gaps or cracks when fixed to a coaxial cable." (*Id.*) Because Holland believes that its connector leaves four gaps due to the square shape of its compression ring, Holland believes that claim 1 cannot be read to cover Holland's connectors. (*Id.* at 10-11).

The Court previously rejected this argument in its *Markman* order. There, in a footnote, the Court noted:

> Finally, Holland conflates the prior art when it states that because PCT admitted during prosecution that the Down patent suffered from cracking and the examiner had previously found a V-shaped band to be obvious, the examiner must have allowed claim 1 solely because of the "purported absence of 'cracking.'" (Doc. 115 at 6 n.2). The examiner initially rejected claims 1 and 2 because a V-shaped band was obvious in light of the Szegda and Cull patents, neither of which taught axial compression, and PCT's claims did not teach axial compression. Although Down taught axial compression, it did not claim the V-shaped band. Thus, PCT distinguished its amended claims from those of Down on the basis of the V-shaped band (which prevents cracking) and separately distinguished its amended claims from those of Szegda and Cull on the basis of axial compression.

(Doc. 124 at 11 n.4). For the same reasons discussed in the *Markman* order, the Court rejects Holland's renewed argument. Accordingly, the presence of any gaps or cracking

---

[10] Although Holland includes this argument in the invalidity section of its motion, this argument relates to infringement, not invalidity, and so the Court will address it here.

in Holland's connectors is not sufficient to preclude PCT from asserting claim 1 of the '422 Patent against Holland for those connectors.

Accordingly, Holland is not entitled to judgment as a matter of law on literal infringement of claim 1 of the '422 Patent.

**C. Invalidity**

Holland argues that as a matter of law, claim 1 of the '422 Patent is invalid as anticipated by, and obvious in view of, United States Patent No. 5,466,173 (the "Down '173 Patent"). (Doc. 408 at 9-10). At trial, Holland had the burden of proving invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

**1. Anticipation**

Holland argues that the Down '173 Patent anticipates claim 1 of the '422 Patent. (Doc. 408 at 11). The jury found that the '422 Patent was not invalid as anticipated. (Doc. 394 at 5). Under 35 U.S.C. § 102, a patentee is generally not entitled to a patent if the "claimed invention was . . . described in a printed publication . . . before the effective filing date of the claimed invention." A reference is anticipatory if it discloses "each and every element of the claimed invention, whether it does so explicitly or inherently." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). "While those elements must be 'arranged or combined in the same way as in the claim,' the reference need not satisfy an *ipsissimis verbis* [identical words] test." *Id.* (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008)) (citations omitted).

Holland contends that all of the limitations of claim 1 of the '422 Patent are present in the Down '173 Patent (Doc. 408 at 11). Specifically, Holland points to figures 21 and 22 of the Down '173 Patent. (*Id.*) Figure 21 shows a collapsible band prior to axial compression, having a flat inner surface and an obtuse angle on the outer surface. (Ex. DX1183 at PCTH0005398). Figure 22 shows a collapsible band after the completion of axial compression, with the collapsible band having an obtuse angle on both the inner and outer surfaces. (*Id.*) Holland argues that during the process of axially compressing

the connector of the Down '173 Patent, the collapsible band necessarily forms two obtuse angles prior to reaching the fully-compressed state shown in Figure 22. (Doc. 408 at 11-12). Thus, Holland contends, because claim 1 of the '422 Patent specifies "prior to axial compression" but does not specify "prior to *any* axial compression," the Down '173 Patent anticipates claim 1 of the '422 Patent. (*Id.*) Holland's argument fails because evidence admitted at trial showed that the Down '173 Patent's collapsible band is flat across the inner surface *prior* to axial compression. (Tr. 1733:8-18). Claim 1 of the '422 Patent claims a collapsible band that has a v-shape with obtuse angles "*prior* to axial compression." '422 Patent col.6 ll.63-64 (emphasis added).

The Down '173 Patent did not disclose a collapsible band having the shape required by claim 1 of the '422 Patent, namely having a v-shaped collapsible band with obtuse angles on both of its inner and outer surfaces. It is not the case, as Holland contends, (Doc. 429 at 9-10), that PCT is evading this alleged disclosure of the Down '173 Patent by adding an additional limitation not found in claim 1 of the '422 Patent. Rather, Holland misinterprets the limitations of claim 1 of the '422 Patent. No reasonable jury could misread the '422 Patent's limitation of "prior to axial compression" according to Holland's suggested interpretation. The Court rejects Holland's attempt to manufacture a disclosure by manipulating figures of the Down '173 Patent and language of the '422 Patent.

Substantial evidence supports the jury's finding that claim 1 of the '422 Patent is valid.

### 2.    Obviousness

Holland next argues that the only reasonable finding that the jury could make with respect to the issue of obviousness was that claim 1 of the '422 Patent was invalid for obviousness. (Doc. 408 at 12-13). The Court submitted a general verdict to the jury on obviousness, and the jury found that claim 1 of the '422 Patent was not invalid for obviousness. (Doc. 394 at 6).

"Obviousness is a question of law based on underlying findings of fact." *Wyers v.*

- 20 -

*Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010). "The underlying factual inquiries include: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Id.* The ultimate legal issue of obviousness is whether "the improvement is more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

In reviewing a jury's findings for an issue of law "submitted to the jury upon disputed facts," the Court must "presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence." *Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed. Cir. 1991). Then the Court examines "the legal conclusion *de novo* to see whether it is correct in light of the presumed jury fact findings." *Id.*; *see also Wyers*, 616 F.3d at 1248 (Linn, J., concurring).

Here, the primary factual dispute between the parties was the scope and content of the prior art. Specifically, Holland contends that the Court improperly admitted the testimony of PCT's expert Dr. Dickens, who testified that he had created samples of the compression groove as taught in the Down patents. (Doc. 408 at 13). Dr. Dickens testified that when he built a sample of the Down compression groove and applied compressive force, the groove erratically deformed, sometimes moving radially closer to what would be the longitudinal axis of the connector, but sometimes forming a "ball" or moving radially farther from the longitudinal axis of the connector. (Tr. 1928:22-1931:9). Dr. Dickens testified that even with precise machining, the Down connector failed to reliably push the compression groove in the intended direction. (Tr. 1231:4-9). Dr. Dickens also testified that gaps and cracks allow moisture to leak into a cable. (Tr. 625:6-11).

Holland argues that Dr. Dickens' testimony regarding his tests of the Down connectors was inadmissible because Dr. Dickens' opinions were not the products of reliable principles and methods. (Doc. 408 at 12-13). Holland argues that the "undisputed evidence at trial showed that heat treating, or annealing, was required in order for any connector with a collapsible band to work." (*Id.* at 12). Because Dr. Dickens did not testify that he annealed his test samples, Holland asserts that Dr. Dickens' testimony was unreliable. (*Id.* at 12-13). This is not the case. Although Timothy Youtsey testified that in PCT's connector manufacturing process, annealing was required to make the metal ductile, (Tr. 1495:20-1496:6), he also testified that generally annealing was not necessary to prevent PCT's design from becoming brittle and cracking, (Tr. 1496:7-11). Timothy Youtsey also could not opine as to whether the Down '173 Patent required annealing. (Tr. 1497:1-3). Holland additionally points to the testimony of Michael Holland, who remarked that United States Patent No. 5,525,076 (the "Down '076 Patent") requires annealing to prevent cracking. (Tr. 1192:18-1194:24). But there was no admissible evidence that either the Down '076 Patent or the Down '173' Patent specified annealing in its claims.

Moreover, there was no evidence that Dr. Dickens did *not* anneal his test samples. Holland errs in presuming from a lack of evidence that Dr. Dickens did not anneal his test samples. Additionally, Michael Holland testified that a person of ordinary skill in the art would know that a connector has to be annealed. (Tr. 1191:19-24). Thus, Michael Holland's testimony supports the inference that Dr. Dickens, as a person skilled in the art, annealed his test samples. Dr. Dickens' testimony was sufficiently reliable to be properly admissible and support the jury's verdict. In conclusion, based on Dr. Dickens' testimony as well as the other evidence of record, substantial evidence supports the jury's implicit finding that the Down connectors suffered from undesirable gaps and cracks which permitted moisture intrusion.

The second factual dispute between the parties was the existence of secondary considerations weighing against obviousness. "Secondary considerations 'may often

establish that an invention appearing to have been obvious in light of the prior art was not.'" *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). However, evidence of secondary considerations is substantial only if there is a nexus "between the merits of the claimed invention and the evidence offered." *Stratoflex*, 713 F.2d at 1539. Here, there was evidence of secondary considerations having a nexus between the evidence and claim 1 of the '422 Patent. Specifically, there was evidence of praise from others in the field in the form of Michael Holland's statement to PCT that "[y]ou made an improvement on the Gilbert patent with a great shape improvement." (Ex. PX032). There also was evidence of commercial success attributable to the shape of the collapsible band claimed in claim 1 of the '422 Patent. *See* (Tr. 104:9-105:5, 1935:6-1936:3). Accordingly, there was substantial evidence of praise from others in the field and commercial success relating to the v-shaped collapsible band claimed in the '422 Patent.[11]

As the Court has noted, in reviewing the jury's obviousness findings, the Court must assume that the jury resolved factual disputes in favor of PCT and uphold those findings if supported by substantial evidence. The Court has reviewed the record and substantial evidence supports the jury's factual findings that (1) the Down connectors suffered from undesirable gaps and cracks that permitted, among other things, moisture intrusion; (2) PCT received praise from others in the field for the v-shaped collapsible band claimed in claim 1 of the '422 Patent; and (3) connectors with the v-shaped collapsible band claimed in claim 1 of the '422 Patent were commercially successful. Accordingly, the Court now turns to the ultimate issue of obviousness.

The thrust of Holland's argument regarding obviousness is that it was obvious from the Down patents that "pre-bending" the Down design would cause the collapse of

---

[11] Although Holland may be correct that PCT did not establish a nexus between the evidence of Michael Holland's request to EZConn regarding copying PCT's design (Ex. PX017) and claim 1 of the '422 Patent because Michael Holland's attached drawing showed a flat inner diameter similar to the Down patents, (Doc. 429 at 11), this does not undermine the jury's findings of other secondary considerations.

the compression groove to be more predictable. (Doc. 408 at 14). Borrowing the language of the Supreme Court in *KSR*, Holland argues that the combination of the elements taught in the Down patents plus "known methods" produces the predictable result of the v-shaped collapsible band claimed in the '422 Patent. (*Id.*); *see also KSR*, 550 U.S. at 416. But Holland fails to identify in its motion any known methods that would result in the '422 Patent's collapsible band. To the contrary, Michael Holland testified that he was not aware of any instance in the coaxial cable connector industry "in which someone who sells axial compression connectors instructs someone to partially axially compress a connector and then install the cable and then compress it again." (Tr. 1440:4-10). This evidence supports a finding that a person of ordinary skill in the art would not perform any "pre-bending" of a collapsible band in an attempt to cause the band to more reliably collapse into a cable's outer insulation.

Other evidence also supports the jury's implicit finding that the v-shaped collapsible band of the '422 Patent was not a predictable result of the Down patents plus known methods. The inventor of the '422 Patent, Timothy Youtsey, testified that he repeatedly tested, machined, examined, and developed various designs before inventing the collapsible band claimed in claim 1 of the '422 Patent. (Tr. 95:11-25). Indeed, Youtsey testified that he knew from his metallurgical experience that sharp angles were problematic, and initially his designs instead focused on a gradual arc. (Tr. 95:13-18). Youtsey spent approximately six months developing his collapsible band design. (Tr. 97:9-13).

Considering the jury's presumed underlying factual findings, the prior art, the known methods in the field of coaxial cable connectors, and all of the evidence concerning obviousness, claim 1 of the '422 Patent was not obvious. The jury did not err in finding claim 1 of the '422 Patent to be not obvious.

## D.    Indefiniteness

Holland contends that claim 1 of the '422 Patent is invalid as indefinite. (Doc. 408 at 15). Holland argues that the Court's construction of certain terms in the '422 Patent

shows that those terms as written failed to inform those of ordinary skill in the art of the scope of the invention with reasonable certainty. (*Id.* at 16). "[A] claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). Rather, "if the meaning of the claim is discernible, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree,'" the claim is not invalid as indefinite. *Id.* (quoting *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

None of the terms construed in the Court's *Markman* order are "insolubly ambiguous." Holland argues that claim 1 of the '422 Patent did not specify which way the obtuse angles were to be measured. (Doc. 408 at 16). But as the Court explained in the *Markman* order, claim 1's language permits only one plausible interpretation of the direction from which the angles are to be measured. *See* (Doc. 124 at 9:10-10:14). Claim 1 of the '422 Patent is not indefinite.

### E.      Extraterritoriality

Holland raised an extraterritoriality argument in its earlier motion for summary judgment. It now re-raises this same argument. (Doc. 408 at 16-17). There was no evidence admitted at trial that is relevant to the legal grounds for the Court's prior denial of this argument. Thus, for the same reasons specified in the Court's ruling on Holland's earlier motion for summary judgment, *see* (Doc. 267 at 4:23-7:10), the Court rejects this argument.

### F.      Infringing Units

The jury found that PCT was entitled to a royalty for Holland's sales of 14,736,522 infringing units. (Doc. 394 at 6). Holland argues that this number of infringing units implies that the jury found a failure to mark and started the damages period in October 2010, but no reasonable jury could select October 2010 as the start date. (Doc. 408 at 1).

### 1.   Background

The relevant portions of the Court's jury instruction regarding marking are as follows:

> In determining damages (i.e. the reasonable royalty), you must determine the date on which damages to PCT began. Damages began on the earliest date on which (1) Holland infringed the '422 Patent and (2) Holland had notice of its alleged infringement of the '422 Patent.
>
> . . . .
>
> If you find that PCT marked its products with the '422 Patent, then Holland is deemed to have notice and you must find the date on which damages began to be the earliest date on which both of the following are true: (1) Holland infringed the '422 Patent and (2) PCT was marking its products with the '422 Patent.
>
> If you find that PCT did not mark its products with the '422 Patent, then you must determine the date on which Holland had actual notice of its alleged infringement of the '422 Patent. To prove the date on which PCT gave Holland actual notice of Holland's alleged infringement of the '422 Patent, PCT must show that PCT communicated to Holland a specific charge of infringement of the '422 Patent by a specific accused product. Regardless of PCT's ability to prove it sent a communication to Holland, this date must be no later than August 21, 2012, because that is the date on which PCT filed its complaint in this case against Holland and filing a complaint qualifies as actual notice.

(Doc. 393 at 34).

### 2.   Analysis

As these instructions explained, there were alternate factual bases for the jury to reach particular findings regarding the number of infringing units to use for a royalty base. For example, if the jury found that PCT did not mark its products but Holland had actual notice of its alleged infringement on a certain date, then that date would begin the damages period. As another example, if the jury found that PCT began to mark its products on a certain date after Holland began its alleged infringement, then that date would begin the damages period. The Court's verdict form did not require the jury to list the factual findings implicit in the jury's ultimate finding regarding the number of connectors to use as a royalty base. Therefore, because the Court must uphold the jury's

verdict if supported by substantial evidence, *Pavao*, 307 F.3d at 918, the Court may grant JMOL only if none of the factual bases for the jury's ultimate finding are supported by substantial evidence.

As an initial matter, substantial evidence supports the jury's finding that the number of infringing units to use as a royalty base was 14,736,522. PCT's expert witness Carl Degen testified that for a damages period beginning in October 2010, the number of infringing units was 14,736,522. (Tr. 1060:13-19). He also testified that although the parties disagreed on the appropriate starting date, they agreed that this was the number of infringing units for the period beginning in October 2010. (Tr. 1060:24-1061:5).

Furthermore, substantial evidence supports the jury's implicit finding of October 2010 as the beginning of the damages period. A reasonable jury could have found that, even if PCT failed to mark its products, PCT gave Holland actual notice of infringement on October 12, 2010 when PCT's in-house counsel sent Holland the following letter:

> PCT International, Inc. recently learned that Holland Electronics is making and selling Superlok Compression Connectors. We believe that features of these connectors are very similar to those disclosed in U.S. Patent No. 6,042,422, which is owned by PCT. We would be happy to discuss such similarities along with any differences that Holland Electronics believes are significant. We would also be willing to discuss possible licensing, if a mutually agreeable understanding can be reached.

(Ex. PX031).

Holland argues that this letter did not provide actual notice of infringement because it failed to specifically charge infringement. (Doc. 408 at 2). Actual notice of infringement under 35 U.S.C. § 287(a) requires more than mere notice of a patent's existence or ownership. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). "To serve as actual notice, a letter must be sufficiently specific to support an objective understanding that the recipient may be an infringer." *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010). Accordingly, it is irrelevant whether the "defendant knew of the patent or knew of his own infringement." *Amsted*, 24 F.3d at 187. Further, "[t]he letter must communicate a charge of infringement

of specific patents by a specific product or group of products." *Id.*

Whether a communication from the patentee to a recipient constitutes actual notice of infringement does not turn on "whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent." *SRI Int'l, Inc. v. Adv. Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997). Rather, as the Federal Circuit has remarked, "the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI Int'l, Inc. v. Adv. Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

Whether PCT's letter to Holland qualifies as an actual notice of infringement under § 287(a) is a close question.[12] Holland's first contention is that the letter's failure to use the word "infringe," mention the claims of the '422 Patent, and specify the particular accused Holland connectors prevents the letter from affirmatively communicating a charge of infringement. (Doc. 408 at 2). PCT replies that Holland's conduct in response to the letter, namely Michael Holland's e-mailed reply to PCT's in-house counsel, proves that the letter was an actual notice of infringement. (Doc. 423 at 6:7-7:12).

PCT's argument fails. PCT cites three district court cases, (Doc. 423 at 6), each of which relies upon a line of reasoning predating the case of *Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001). In *Gart*, the Federal Circuit rejected the notion that determining whether a communication was sufficiently specific regarding the patentee's belief that the recipient may be an infringer involves a consideration of the recipient's knowledge or understanding. 254 F.3d at 1345-46. There, the Federal Circuit held that "whether or not the alleged infringer subjectively believed that the patentee's letter was a charge of infringement has no bearing on the adequacy of notice." *Id.* at 1346. Thus,

---

[12] As an initial matter, PCT's argument that Holland has admitted this letter was an allegation of infringement is unpersuasive. *See* (Doc. 423 at 4). Although Holland described the letter as "an allegation of patent infringement" in its Amended Answer, this admission was not included in the Final Pretrial Order (Doc. 322). "A final pretrial order supersedes all prior pleadings and controls the subsequent course and scope of the action." *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 818 F. Supp. 2d 1193, 1207 (E.D. Cal. 2011).

although Holland acknowledged that PCT's letter was a notice of infringement, this subjective belief does not by itself support a finding that the letter was an actual notice of infringement. However, for the same reason, Holland's argument that PCT did not subjectively believe its own letter to be a charge of infringement also fails.[13] *See* (Doc. 408 at 2:10-15; Doc. 429 at 5:11-24).

Rather, the issue is whether PCT's letter is sufficiently specific to support an objective understanding that PCT believed that Holland may be an infringer. *See Funai*, 616 F.3d at 1373. Holland argues that the letter is not sufficiently specific because it does not identify specific model numbers of accused Holland products, instead mentioning only Holland's "Superlok Compression Connectors." (*Id.*) Evidence at trial showed that the accused products are Holland's "Superlok" connectors, and each of these connectors has a similarly-shaped outer barrel component. (Tr. 527:13-528:7, 1559:13-1560:11). PCT's letter referenced this product family. (Tr. 838:15-16). This was sufficiently specific to identify specific products that PCT believed to infringe the '422 Patent, even without a list of particular model numbers.

Holland also argues that because the letter does not cite specific claims of the '422 Patent or assert that Holland's products are "covered by" any specific claims of the '422 Patent, it did not communicate a specific charge of infringement. (Doc. 408 at 2). It is true, as Holland recites, that the scope of patent protection is governed by the patent claims, and not the disclosures in the specification. (Doc. 429 at 5-6). But it does not automatically follow that a reference to a patent's disclosures can never have infringement implications. Although Holland insists that *Gart* requires reference to specific patent claims, (Doc. 429 at 6), there is no such holding in *Gart*. Rather, PCT's letter clearly implied that Holland's Superlok connectors might infringe the '422 Patent: "We believe that features of these connectors are very similar to those disclosed in U.S.

---

[13] The Court notes that to the extent PCT's letter may fall short of creating an actual controversy under the Declaratory Judgment Act, "[t]he criteria for actual notice under § 287(a) are not coextensive with the criteria for filing a declaratory judgment action." *SRI*, 127 F.3d at 1470.

Patent No. 6,042,422." (Ex. PX031). A reasonable jury could find that this sentence clearly charged Holland with infringement of the '422 Patent because a reasonable jury could conclude that accusing a product of resembling the preferred embodiment of an invention also accuses the product of infringing the claims of that invention, particularly when the accusatory communication is sent by in-house counsel.

More significantly, PCT offered to discuss licensing terms with Holland: "We would also be willing to discuss possible licensing, if a mutually agreeable understanding can be reached." In *Gart*, the Federal Circuit noted that "[t]he whole point of offering a license is to insulate a licensee from infringement charges by the licensor." *Gart*, 254 F.3d at 1346. Thus, PCT's suggestion that the parties negotiate a license for Holland to use the '422 Patent constitutes clear evidence of an objective understanding that Holland may be an infringer.[14]

In arguing to the contrary, Holland relies on three cases. First, it cites *Storus Corp. v. Aroa Marketing, Inc.*, 2008 WL 276385 (N.D. Cal. Jan. 31, 2008). (Doc. 408 at 2). The communication in that case is distinguishable because it did not identify a specific accused product but only referred to "a card and money holder being advertised and sold by [EVS] in [EVS's] January, 2001 Gadget Universe catalogue." 2008 WL 276385, at *4. It also did not communicate a specific charge of infringement because instead of offering a license or calling the recipient a possible infringer, it only invited the recipient to "review" the patent and "discuss" whether it applied. *Id.* Similarly, *Jackson v. Intel Corp.*, 2009 WL 2851742 (N.D. Ill. Aug. 31, 2009) is distinguishable because the communication at issue specifically stated that the patentee had no opinion as to whether the recipient's products infringed. 2009 WL 2851742, at *4. Finally, *Crown Packaging*

---

[14] PCT's language concerning its willingness to discuss similarities and differences between Holland's Superlok connectors and the disclosures of the '422 Patent does not undermine this conclusion. The fact that a patentee invites an alleged infringer to prove why the patentee may be mistaken as to infringement does not preclude a communication from objectively communicating a charge of infringement. PCT's language resembles that in *SRI*, in which the patentee stated: "If you are of the opinion that you do not need a license from SRI, it would be helpful if you could give us some insight into your reasons." *SRI*, 127 F.3d at 1470. There, the Federal Circuit affirmed the district court's finding of actual notice. *Id.*

- 30 -

*Technology, Inc. v. Rexam Beverage Can Co.*, 498 F. Supp. 2d 718 (D. Del. July 24, 2007), involved a letter sent to every customer of a particular machine. 498 F. Supp. 2d at 723. That letter stated that it was the recipient's responsibility to determine if a license was required. *Id.* n.10. This clearly differs from PCT's letter, which was specifically targeted at Holland and accused Holland of infringement by offering to discuss a license.

Accordingly, PCT's letter was an actual notice of infringement for purposes of 35 U.S.C. § 287(a).[15]

## V.   Motion for an Accounting

PCT moves for an accounting of damages owed to it by Holland for the infringement of the '422 Patent through the Court's entry of judgment, including prejudgment and post-judgment interest. (Doc. 405 at 1).

### A.   Accounting

#### 1.   Legal Standard

35 U.S.C. § 284 requires a court, upon finding for a claimant, to "award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." The statute further provides that "[w]hen the damages are not found by a jury, the court shall assess them." 35 U.S.C. § 284. In *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), the Federal Circuit noted that under this statute, "a patentee is 'not fully compensated' if 'the damages award did not include future lost sales.'" 626 F.3d at 1213 (quoting *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 881 (Fed. Cir. 1995)). Accordingly, the Federal Circuit held that the patentee was entitled to compensation "for any infringement prior to the injunction." *Id.*

#### 2.   Analysis

Holland first argues that PCT is not entitled to an accounting because PCT failed

---

[15] The Court has not addressed PCT's alternative argument that the jury could have found PCT complied with the marking requirements beginning in October 2010 because after reviewing the evidence and the parties' arguments, the Court cannot conclude that a reasonable jury could have chosen October 2010 as the starting period for damages based solely upon PCT's compliance with the marking statute.

to request an accounting in the Final Pretrial Order or in its pleadings, and PCT has not made the requisite showings under Rule 16 to amend these filings to add such a request. (Doc. 424 at 1-2).

The Federal Circuit has repeatedly foreclosed Holland's argument. In *Finjan*, the defendants argued that because the plaintiff's complaint "sought only 'such damages as it shall prove *at trial*,'" the plaintiff waived its right to any further damages other than those found by the jury. 626 F.3d at 1212-13. The Federal Circuit flatly rejected this argument, holding that "nothing in this statement forfeited the right to prove damages for sales that occurred after trial." *Id.* at 1213. Additionally, the court noted in dicta that the complaint requested "[s]uch further and other relief as the Court and/or jury may deem proper and just," implying that this request could also support an award of post-verdict damages. *Id.*

In *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), the Federal Circuit reaffirmed the propriety of a post-verdict accounting. There, the district court had denied an accounting, finding that the plaintiff failed to request an accounting in the amended complaint or in the joint pretrial order. 711 F.3d at 1380. The Federal Circuit reversed, finding that the plaintiff's requests in its complaint for "money damages sustained as a result of defendants' infringement" and "such other and further relief as this Court finds just and proper" confirmed that the plaintiff "intended no waiver of any appropriate remedy." *Id.* at 1381. However, the Federal Circuit limited the scope of the accounting to "those post-verdict infringing sales, if any, which are substantially related to the direct infringement . . . which the district court finds supported by the existing record." *Id.*

PCT requested in its complaint that the Court enter judgment "[o]rdering Holland to account for and pay to PCT the damages to which PCT is entitled as a consequence of the infringement, the precise amount of which shall be determined at trial." (Doc. 1 at 4). PCT also requested "a post-judgment equitable accounting of damages for the period of infringement of the '442 [sic] Patent following the period of damages established by PCT at trial," as well as "such other and further relief as the Court deems PCT may be entitled

to in law and equity." (*Id.*) Furthermore, in the Final Pretrial Order, PCT contended that it was "entitled to damages sufficient to compensate it for each of Holland's acts of infringement of the '422 Patent in an amount to be determined at trial, but in no event less than a reasonable royalty." (Doc. 322 at 6:23-25).

Like the plaintiff's requests in *Power Integrations*, nothing in PCT's explicit requests for monetary damages was temporally limited to only pre-verdict damages. Furthermore, PCT explicitly requested in its complaint an accounting of all damages other than those established at trial. Finally, PCT's request in the Final Pretrial Order for damages "in an amount to be determined at trial" is indistinguishable from the request at issue in *Finjan*, which the Federal Circuit held did not "forfeit[] the right to prove damages for sales that occurred after trial." *Finjan*, 626 F.3d at 1213. For these reasons, PCT has not waived its right to an accounting of infringing sales.[16]

Holland also argues that even if PCT is entitled to an accounting, any accounting cannot include pre-verdict infringing sales that the jury did not consider. (Doc. 424 at 2). Holland offers no authorities contradicting the proposition that a court can order an accounting of pre-verdict damages not considered by the jury; rather, Holland relies upon the fact that *Finjan* and other Federal Circuit cases did not address the issue of whether pre-verdict damages can also be the subject of an accounting. (Doc. 424 at 2-3).

*Finjan*, *Power Integrations*, and other Federal Circuit cases stand for the proposition that compensatory damages to a patentee include all money damages that arise as the result of the infringement. Courts have applied this principle in ordering accountings even for infringing activity that occurs pre-verdict. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 2011 WL 4899922, at *3-4 (E.D. Va. Oct. 14,

---

[16] Holland cites three district court cases in support of its argument that PCT waived its right to an accounting. (Doc. 424 at 1-2). In particular, *Metso Minerals, Inc. v. Powerscreen International Distribution Limited*, 833 F. Supp. 2d 333 (E.D.N.Y. 2011) is unpersuasive for two reasons. First, the court in *Metso Minerals* relied upon *Finjan* to find that the plaintiff did *not* waive its right to an accounting. 833 F. Supp. 2d at 350-51. Second, although the court did not find a waiver, it rested the proposition that such a waiver could be warranted upon three district court cases predating the Federal Circuit's holdings in *Finjan* and *Power Integrations*, most notably the very district court opinion that the Federal Circuit reversed in *Power Integrations*. *See id.* at 350.

- 33 -

2011); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 960-61 (N.D. Cal. Feb. 23, 2009). Although Holland asserts that *Hynix Semiconductor* involved an award of only post-verdict damages, the court considered supplemental damages for "Hynix's infringement after December 31, 2005, the last date for which Rambus was able to present evidence of Hynix's DRAM sales to the jury." *Hynix*, 609 F. Supp. 2d at 959-60. The jury returned its verdict on April 26, 2006, *id.* at 955, and the court granted the damages request "for supplemental damages for the period after December 31, 2005," *id.* at 987.

Despite Holland's arguments that PCT's requested accounting is an untimely expansion of the pleadings and Final Pretrial Order and requires reopening discovery, (Doc. 424 at 3), the Court cannot discern a principled distinction in this case between an accounting of pre-verdict damages and post-verdict damages. The Court has not found any Federal Circuit precedent that addresses accounting for pre-verdict damages, but PCT can receive its full measure of compensatory damages only if pre-verdict damages are included in any accounting. This is consistent with the principles of *Finjan* and *Power Integrations*. As the district court stated in *Hynix Semiconductor*, "[f]ailure to award such damages may not necessarily create a 'windfall' for the infringer because the patentee could file another complaint alleging infringement occurring after the time period tried in the first case, but requiring such additional litigation would be inefficient and unhelpful, serving only to delay the patentee's right to recover." 609 F. Supp. 2d at 961.

Thus, PCT is entitled to an accounting of Holland's sales of infringing products from February 26, 2015 (the day following the last day for which evidence of Holland's sales was submitted to the jury) through September 8, 2015.[17] However, because the jury found sixty particular Holland model numbers to infringe the '422 Patent, and

---

[17] Holland asks the Court to delay ordering any accounting until the resolution of any appeals in this case. (Doc. 424 at 3). The Court declines Holland's requests because any appeal is speculative at this juncture, and the Court sees no reason for denying a party less than complete relief merely because of the possibility of future appeal. *But cf. Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100 (N.D. Cal. 2014) (delaying an accounting of supplemental damages because the parties indicated an appeal was "anticipated").

1  presumably the quantity of Holland's sales is not in dispute, there is no reason why the

2  parties should be unable to agree upon the number of infringing sales for this period.

3  Accordingly, the Court will order the parties to meet and confer regarding this

4  accounting. If an agreement is not reached, then the parties may submit a proposed

5  briefing schedule for an accounting.

6      **B.    Prejudgment Interest**

7      PCT requests an award of prejudgment interest on all damages incurred prior to

8  the Court's entry of judgment. (Doc. 405 at 3).

9      **1.    Legal Standard**

10      "Prejudgment interest may be assessed by the district court after damages have

11  been found." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983).

12  The purpose of prejudgment interest is to "compensate for the delay in payment of the

13  damages, and not to punish the infringer." *Id.* The Supreme Court has held that the

14  requirement of 35 U.S.C. § 284 that a court "shall award" a patentee "damages adequate

15  to compensate for the infringement" ordinarily includes an award of prejudgment interest.

16  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983). This recognizes that in an

17  infringement action, damages "consist not only of the value of the royalty payments but

18  also of the foregone use of the money between the time of infringement and the date of

19  the judgment." *Id.* at 655-56.

20      Although prejudgment interest should ordinarily be awarded, there are some

21  circumstances, such as "undue delay in prosecuting the lawsuit," in which a court may

22  limit or deny prejudgment interest. *Id.* at 657. With respect to delay, the Federal Circuit

23  has held that a finding of laches and a denial of prejudgment interest are coextensive. *See*

24  *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988) (agreeing

25  with an argument to this effect). Thus, "[a]bsent prejudice to the defendants, any delay by

26  [the patentee] does not support the denial of prejudgment interest." *Crystal*

27  *Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361-62

28  (Fed. Cir. 2001) (quoting *Lummus*, 862 F.2d at 275).

2.      **Analysis**

Holland first argues that the jury's award of damages encompasses any prejudgment interest because it was for "total damages," and therefore PCT is barred from seeking any additional damages. (Doc. 424 at 4). This argument is completely contrary to Federal Circuit and Supreme Court case law, as the Court has cited above, and is without merit. The jury's award in this case clearly did not include prejudgment interest, and PCT did not waive its claim for prejudgment interest, *see* (Doc. 1 at 4:13-15).

Next, Holland argues that PCT is not entitled to prejudgment interest because PCT unduly delayed in prosecuting its claim. (Doc. 424 at 4:16-5:24). For the reasons specified in the Court's findings and discussion concerning laches, the Court concludes that PCT did not unduly delay in prosecuting its claim, and barring prejudgment interest would be improper when the Court has not found laches.[18] *See Lummus*, 862 F.2d at 275.

PCT is entitled to prejudgment interest.[19] The Court enjoys wide discretion in setting the rate of prejudgment interest. *See Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1145 (Fed. Cir. 1991). PCT contends that the appropriate rate is Arizona's statutory prejudgment rate, which is the prime rate at the time of judgment plus 1 percent. *See* A.R.S. § 44-1201(B). Holland does not dispute this rate in its response to PCT's motion. (Doc. 424). The Court has reviewed Federal Circuit and other helpful case law, including the detailed discussion of the appropriate prejudgment interest rate contained in *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128 (D.N.J. 2007), and agrees that Arizona's statutory prejudgment interest rate is appropriate in this case. This is currently 4.25%.

The Court calculates the prejudgment interest award using the number of

---

[18] Holland cites *Crystal Semiconductor* for the proposition that a two-year delay causes prejudice to a defendant that justifies a denial of prejudgment interest. (Doc. 424 at 4). This case involved evidence that the patentee's delay "was a litigation tactic," and is therefore distinguishable. *See Crystal Semiconductor*, 246 F.3d at 1362.

[19] The Court rejects Holland's argument that any award of prejudgment interest should be limited to the period ending February 25, 2015, (Doc. 424 at 5-6), for the same reasons discussed with respect to PCT's request for an accounting.

infringing units for each year (assuming year-end royalty payments and using the jury's implicit royalty award of 3.5 cents per infringing unit) and calculating simple interest from each imputed year-end payment until the date of the Court's judgment:[20]

| Time Period | Royalty Owed | Accrued Interest | Total Interest |
|---|---|---|---|
| October – December 2010 | $17,543.58 | $4.25\% \times (4 + \frac{251}{365})$ | $ 3495.14 |
| 2011 | $58,357.67 | $4.25\% \times (3 + \frac{251}{365})$ | $ 9,146.17 |
| 2012 | $115,422.19 | $4.25\% \times (2 + \frac{251}{365})$ | $ 13,184.22 |
| 2013 | $133,829.99 | $4.25\% \times (1 + \frac{251}{365})$ | $ 9,599.09 |
| 2014 | $170,791.78 | $4.25\% \times \frac{251}{365}$ | $ 4,991.57 |
| 1/1/2015 – 2/25/2015 | $19,833.07 | 0% | $19,833.07 |
| Total | $515,778.27[21] | — | $ 60,249.26 |

Accordingly, the Court will award PCT $60,249.26 in prejudgment interest.[22]

### C. Post-judgment Interest

PCT argues that it is entitled to post-judgment interest. (Doc. 405 at 5). All judgments issued in the District of Arizona are subject to the post-judgment interest statute, 28 U.S.C. § 1961, regardless of whether the judgments specify post-judgment interest. Thus, this is not an issue for the Court at this time.

## VI.    Motion for Permanent Injunction

PCT moves for a permanent injunction enjoining Holland from manufacturing, importing, using, selling, or offering to sell any Holland products found by the jury to

---

[20] The source for the data in the following table is Doc. 405-2.

[21] The values in this column sum to $515,778.28 due to rounding.

[22] Because any accounting of Holland's infringing units from February 25, 2015 to the date of this Order will still fall within the 2015 calendar year, there will be no prejudgment interest on those supplemental damages.

1   infringe the '422 Patent (along with any colorable imitations thereof). (Doc. 404 at 2).

2       **A.    Legal Standard**

3       A plaintiff seeking a permanent injunction "must demonstrate: (1) that it has

4   suffered an irreparable injury; (2) that remedies available at law, such as monetary

5   damages, are inadequate to compensate for that injury; (3) that, considering the balance

6   of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

7   that the public interest would not be disserved by a permanent injunction." *eBay Inc. v.*

8   *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Apple Inc. v. Samsung Elecs.*

9   *Co. (Apple III)*, 735 F.3d 1352, 1359 (Fed. Cir. 2013). An injunction is a "drastic and

10  extraordinary remedy, which should not be granted as a matter of course." *Apple III*, 735

11  F.3d at 1359 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

12      **B.    Irreparable Harm**

13      PCT alleges that it has suffered three types of irreparable harm as a result of

14  Holland's infringement: (1) lost sales and market share, (2) lost brand distinction, and (3)

15  injury to PCT's reputation as an innovator. (Doc. 404 at 3-6).

16      **1.    Legal Standard**

17      "[T]here is no presumption of irreparable harm upon a finding of patent

18  infringement." *Id.* at 1359 (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142,

19  1148 (Fed. Cir. 2011)). Rather, a patentee "must establish both of the following

20  requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a

21  sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Id.*

22  at 1359-60 (quoting *Apple Inc. v. Samsung Elecs. Co. (Apple II)*, 695 F.3d 1370, 1374

23  (Fed. Cir. 2012)). Irreparable harm "encompasses different types of losses," such as "lost

24  sales and erosion in reputation and brand distinction." *Douglas Dynamics, LLC v. Buyers*

25  *Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). The causal nexus requirement applies

26  "regardless of the complexity of the products" at issue; however, the patentee need not

27  show that "a patented feature is the exclusive reason for consumer demand." *Id.* at 1362,

28  1364. The patentee must only show "some connection between the patented feature and

demand for [the defendant's] products." *Id.* at 1362, 1364. This showing can be made "with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions" or that the inclusion (or absence) of a patented feature makes a product significantly more (or less) desirable. *Id.* at 1364.

### 2.    Background

PCT has presented evidence that Holland competes with PCT in the market for coaxial cable connectors. Although Holland had not been a significant competitor of PCT in the United States market prior to Holland's acquisition by Amphenol, (Tr. 878:18-879:1), Holland has become a significant competitor because Amphenol is a very large company that expanded into PCT's market space through its purchase of Holland. (Tr. 877:9-878:6). Amphenol owns other companies that manufacture coaxial cable, and together the Amphenol entities have begun to co-market products with Holland. (Tr. 879:7-13).

PCT distinguished itself from its competitors by providing a "whole package" solution by which PCT provided connectors, splitters, cables, and other cable-related products so that customers could purchase all of their needed components from a single entity. (Tr. 880:13-22). Amphenol's acquisition of Holland enabled Amphenol and Holland to compete with PCT in offering whole package solutions. (Tr. 879:21-880:12). The U.S. market for coaxial cable connectors is highly competitive, has a high barrier to entry, and drives the markets in the rest of the world for connectors. (Tr. 881:14-21). PCT distinguishes itself in this market in part by performing rigorous testing. (Tr. 872:10-12, 882:3-9). PCT's testing facility occupies approximately 4,000 square feet and is used to test PCT designs both individually and collaboratively with PCT's customers. (Tr. 872:10-11, 873:15-874:4); *see also* (Tr. 86:18-87:23). PCT's testing facility prevents PCT from having to rely upon the testing of Asian contract manufacturers. (Tr. 874:9-13).

The evidence shows that Holland takes a different approach to the development of its products. Reed Gibson, a Holland engineer, testified that it did not matter whether the

connectors manufactured by its Asian contract manufacturer EZConn matched Holland's design drawings as long as the outside dimensions were correct and the connector passed Holland's tests. (Tr. 405:20-407:2). Michael Holland, the founder of Holland, testified that EZConn would send Holland samples without drawings because EZConn knew that Holland would only care if they "worked." (Tr. 1268:3-17). EZConn also regularly changed Holland's engineering drawings without informing Holland of the changes. (Tr. 1268:25-1269:13). EZConn also sent samples and drawings that did not conform to each other. (Tr. 1270:13-23). Michael Holland testified that for ten or twenty years, Holland left its engineering up to EZConn, who would regularly send samples that might not work and drawings that might not match the sample. (Tr. 1271:1-9). Holland regularly worried that even if it approved a particular connector design, "who knows what they'd manufacture." (Tr. 1271:7-9).

The U.S. market for coaxial cable connectors consists of purchases by large telecommunication companies such as Cox Communications, AT&T, and Verizon. (Tr. 876:12-21). Although there used to be hundreds of customers in the U.S. for coaxial cable connectors, consolidations have resulted in approximately ten remaining customers. (Tr. 874:19-875:2). Selling a particular coaxial cable connector to these companies requires an exhaustive, lengthy process that begins with a connector manufacturer (such as PCT) making a proposal to the telecommunication company. (Tr. 883). PCT then sends its salespeople to meet with the telecommunication company's employees at headquarters; if the telecommunication company's engineers express interest in the product, then PCT supplies the specifications for the product. (*Id.*) The telecommunications company then engages in a field trial where the product is given to installers and used in the field. If the installer field reports are favorable, then the telecommunications company sends its top engineers to PCT's facilities to engage in testing, which can take over a year. (*Id.*) Finally, once the engineers have approved the product, the telecommunications company gives PCT an approval number which grants PCT the ability to sell the product to the telecommunications company. (Tr. 884).

Prior to Holland's infringement of the '422 Patent, PCT was the only company selling a connector with a collapsible band. (Tr. 1365:4-9); *see also* (Tr. 104:9-18). After Holland redesigned its connector to infringe the '422 Patent, Holland and PCT are now the only two companies on the market selling a connector with a collapsible band. (Tr. 1365:10-14). PCT has never licensed any of its patents, and it is PCT's goal to be the only seller of products covered by the '422 Patent. (Tr. 767:25-768:1, 895:8-10).

Holland has been able to command a premium price for its connectors that infringe the '422 Patent versus its connectors that use crimp, rather than axial compression. (Tr. 273:2-10). Holland markets its infringing connectors as having a grip ring that provides a compression point to seal and hold the coaxial cable in the connector. (Tr. 1560:6-11, 1561:4-10).

### 3.      Analysis

PCT first argues that its unwillingness to license its patents supports a finding of irreparable harm. Because PCT has never licensed any of its patents, with the goal of maintaining exclusivity over its inventions by being the only seller of products containing the collapsible band claimed in the '422 Patent, this indicates that PCT has suffered irreparable injury from Holland's infringement. "Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation. . . ." *Douglas Dynamics*, 717 F.3d at 1345. As the Federal Circuit remarked in *Douglas Dynamics*, "[w]here two companies are in competition with one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Id.*

PCT also correctly contends that Holland's infringement undermines PCT's reputation as an innovator and market leader. Prior to Holland's infringement of the '422 Patent, PCT had the only connector on the market with a collapsible band. PCT has since lost its brand distinction and reputation as a leader as a result of Holland's connectors being on the market and also containing a collapsible band. Holland markets its infringing connectors as a superior choice because of their collapsible band, thus

- 41 -

undermining PCT's market-leading position.

Holland is correct, however, that PCT has not presented evidence of lost sales as a result of Holland's infringement. PCT presented evidence only of international lost sales, (Tr. 893:16-894:8), which cannot support a finding of irreparable harm. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000). But lost sales are not necessary to make a showing of irreparable harm. In *Douglas Dynamics*, the patentee failed to show it was "losing sales or market share" to the infringer, and the patentee's market share had increased approximately 1% per year after the infringing products were introduced to the market. *Douglas Dynamics*, 717 F.3d at 1344. The Federal Circuit held that "[s]imply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury." *Id.* There, the court noted that the mere introduction to a market of an infringing product with similar features causes the patentee's products to lose some of its "distinctiveness and market lure." *Id.* Because the record showed that the patentee had dedicated significant time and money towards marketing, sales, engineering, and R&D, earning a reputation as "an innovator and trusted supplier of quality snowplows," the patentee had suffered irreparable harm. *Id.* at 1344-45.

Similarly, PCT presented evidence of its dedication towards providing a high-quality, complete solution for its customers, including an emphasis on extensive testing and control over its product quality. The introduction in the market of Holland's infringing products caused PCT's products to lose their distinctiveness and market lure, as evidenced by the fact that Holland became only the second supplier in the market to offer the collapsible band, and Holland highlighted the collapsible band (e.g., the grip ring) in its marketing materials. Accordingly, PCT has shown irreparable harm.

PCT must also show a causal nexus between the irreparable harm and Holland's infringement. The purpose of the causal nexus requirement is to distinguish between "irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition." *Apple III*, 735 F.3d at 1361. The Federal Circuit has

explained that when the products at issue are "relatively simple," in the sense that they have a small number of features, the causal nexus requirement is easier to satisfy because the infringing feature has a large impact on demand for the products. *See id.* at 1362.

Here, the testimony showed that coaxial cable connectors are relatively simple products, with only a few features. More significantly, PCT and Holland competed in the same "design wins" market. In *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013), the Federal Circuit addressed the issue of a causal nexus in the context of a "design wins" market, which it described as one in which "the sales are 'design wins,' not a steady flow of discrete product sales." *Broadcom*, 732 F.3d at 1337. In *Broadcom*, the relevant market had a limited set of customers, with "an incumbency effect which enhances a winning supplier's ability to successfully compete in successive design competitions." *Id.* There, the Federal Circuit held that "exclusion from a fair opportunity to compete for design wins constitutes irreparable harm." *Id.*

The coaxial cable connector market resembles the "design wins" market described in *Broadcom* much more closely than it resembles the discrete sales of smartphones at issue in *Apple II or Apple III.* The evidence at trial showed that connector suppliers could only sell their products to their customers (i.e. the telecommunication companies) if they passed a gauntlet of engineering tests and received approval for a particular product. This is a quintessential "design wins" market because the design of a connector entirely controls the outcome of the engineering tests and whether the connector supplier is approved for future sales to that telecommunication company. It is not the case that the telecommunications companies shop on the market for individual connectors in the same way that the public shops for smartphones. As in *Broadcom*, because Holland could get its infringing connectors to pass the engineering tests due to the advantages of the '422 Patent, Holland's infringement excluded PCT from a fair opportunity to compete for design wins. Thus, Holland's infringement is clearly linked to PCT's harm.

Furthermore, Holland's own testimony revealed that including the infringing collapsible band on Holland's products, which Holland asserted was a valid non-

infringing alternative, cost Holland approximately $450,000 over the course of Holland's sales of infringing units. (Tr. 1877:5-1878:5). Thus, the fact that Holland incurred additional expense to infringe the '422 Patent suggests that Holland believed consumers demanded the features provided by PCT's collapsible band. For all of these reasons, the Court concludes that PCT has shown a causal nexus between its irreparable harm and Holland's infringement.

Holland argues that PCT cannot show any future injury sufficient to demonstrate irreparable harm because Holland has ceased selling the infringing products. (Doc. 425 at 5). Holland's sole basis for its argument is the cross-examination testimony of its expert David Haas, who testified that Holland was currently selling a product that had a compression groove with a flat inner diameter. (Tr. 1859:3-4). Holland's argument fails for two reasons. First, the preceding context of this testimony makes clear that Mr. Haas believed the Holland products accused of infringement did not infringe *because* they had a flat inner diameter. (Tr. 1857:14-1859:4). Thus, to the extent Mr. Haas intended his answer to characterize the Holland products as non-infringing and not to assert that Holland had redesigned its products, because the jury rejected Holland's non-infringement contentions, Mr. Haas's testimony on this point is properly given no weight.

Second, and more significantly, Mr. Haas testified only that "Holland is selling a product presently that has a flat inner diameter." (Tr. 1859:3-4). Mr. Haas never testified, nor was there any other evidence presented, that Holland has ceased selling the infringing products. Indeed, it is impossible to conclude from Mr. Haas's statement that Holland has ceased selling the infringing products. It is not necessarily the case that if Holland sells "a product presently that has a flat inner diameter," it is no longer also selling products that infringe the '422 Patent. Furthermore, Mr. Haas's statement did not identify any model numbers or in any way relate his mention of a "product" to any of the accused Holland products in this case. Hypothetically, Holland could be selling another entire line of connectors with a flat inner diameter, with model numbers not at issue in this case. Thus, Holland cites no evidence that shows Holland has ceased infringing the '422 Patent.

In sum, PCT has shown the existence of irreparable harm as well as a causal nexus between that harm and Holland's infringement. The Court now turns to the remaining factors of the equitable test for a permanent injunction.

## C.    Inadequacy of Legal Remedies

PCT claims that remedies available at law, such as monetary damages, are inadequate to compensate PCT for Holland's infringement because PCT has a right to exclusivity by virtue of the '422 Patent and monetary relief cannot protect PCT's right to exclude. (Doc. 404 at 9-10). The question of whether legal remedies are adequate to compensate PCT for Holland's infringement rests on whether PCT was willing to license the '422 Patent. Holland contends that PCT was willing to license its patents and this willingness "indicates that [PCT's] injury is adequately compensable in monetary damages." (Doc. 425 at 6). PCT's October 12, 2010 letter to Holland stated that "[w]e would also be willing to discuss possible licensing, if a mutually agreeable understanding can be reached." (Ex. PX031).

The Federal Circuit has held that even a patentee's past willingness to license its patent does not preclude a finding that a reasonable royalty will not compensate for infringement: "The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent. In view of that right, infringement may cause a patentee irreparable harm not remediable by a reasonable royalty. While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008). In *Acumed*, the patentee had twice previously licensed its patents. *Id.* The Federal Circuit held that the district court did not abuse its discretion in weighing "the fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer" to conclude that no adequate remedy at law existed for future infringement. *Id.* Thus, according to *Acumed*, even a patentee's licensing of its patents does not foreclose a finding of the inadequacy of legal

1    remedies.

2        Because PCT has *never* licensed any of its patents, the facts of the present case

3    weigh more heavily in favor of finding legal remedies to be inadequate than the facts in

4    *Acumed*. Moreover, PCT's October 2010 letter does not undermine PCT's assertion that

5    no remedy at law can protect its constitutionally-guaranteed right to exclude others from

6    selling products covered by the '422 Patent. PCT never offered Holland a license to the

7    '422 Patent; instead, PCT offered to *discuss* licensing with Holland. At the time PCT sent

8    its letter to Holland, PCT had not made any firm decision that it wanted to offer a license

9    to Holland. (Tr. 889:17-19). PCT's letter was a generic letter that it sent to possible

10   infringers of its products. (Tr. 889:9-16). Because PCT never actually offered a license to

11   Holland, PCT's letter did not suggest that PCT accepted monetary damages as adequate

12   compensation for Holland's infringement.

13       Accordingly, the Court finds that PCT has shown it has no adequate remedies at

14   law to compensate it for Holland's infringement.

15       **D.    Balance of Hardships**

16       The balance of hardships factor "assesses the relative effect of granting or denying

17   an injunction on the parties." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed.

18   Cir. 2010). Factors that can be considered include "the parties' sizes, products, and

19   revenue sources." *Id.* The expenses of the infringer in creating the infringing products

20   and the cost of redesigning the infringing products are not relevant to the balance of

21   hardships analysis because "neither commercial success[] nor sunk development costs[]

22   shield an infringer from injunctive relief." *Id.* at 863. "[O]ne who elects to build a

23   business on a product found to infringe cannot be heard to complain if an injunction

24   against continuing infringement destroys the business so elected." *Broadcom Corp. v.

25   Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (quoting *Windsurfing Int'l, Inc. v.

26   AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)).

27       The development of the '422 Patent for PCT had a major impact upon the

28   company. Although PCT initially was a small company, the new technology embodied in

the '422 Patent enabled PCT to sell millions of connectors and essentially built PCT's business. (Tr. 104:17-105:5, 870:20-871:12). Products using the '422 Patent are the top two or three products in terms of sales for PCT. (Tr. 870:22-24). To the contrary, Holland is owned by Amphenol, a company significantly larger than PCT. (Tr. 878:8-10). Holland's infringing products represent approximately 2% of Holland's total sales. (Tr. 1827:8-11). Thus, the relative size differences between the parties, the significance of '422 Patent products to PCT's sales, and the insignificance of Holland's infringing products to Holland's sales lead to the conclusion that the balance of hardships favors PCT.

Additionally, Holland admits that it has a non-infringing alternative available to it in the form of a connector using a collapsible ring with a flat inner surface, which Holland has approved for manufacture. (Tr. 1342:24-1343:15). The presence of a non-infringing alternative that is easily deliverable to the market weighs in favor of the infringer ceasing infringement and pursuing "a lawful course of market conduct." *Douglas Dynamics*, 717 F.3d at 1345.

Finally, Holland argues that PCT's injunction would bar it from selling non-infringing connectors under the same model numbers found at trial to have infringed the '422 Patent. (Doc. 425 at 6-7). First, there is no evidence that Holland has redesigned its connectors and is now selling non-infringing connectors under the same part numbers. Second, neither the sunk costs of having longstanding model numbers for Holland's connectors nor the fact that Holland's business model relies upon infringement of the '422 Patent[23] are proper factors in a balance of hardships analysis. *See i4i*, 598 F.3d at 863. Because the jury found sixty models of Holland's connectors to infringe, a proper

---

[23] As further evidence on this point, Holland was sued in 2005 for patent infringement regarding its connectors by a company named John Mezzalingua Associates ("PPC"). (Tr. 296:16-19). PPC accused Holland's SLCU-6 connector of infringement; Holland's response was to redesign the connector but to keep the same part number. (Tr. 307:14-308:14). Holland's SLCU-6 connector that was redesigned in response to the PPC lawsuit is the same SLCU-6 connector at issue in the present lawsuit. Thus, there is some evidence that Holland's business model relies upon keeping the same part numbers while shifting the connector design from one infringing (allegedly infringing, in the case of PPC) design to another.

injunction must enjoin the infringement of the '422 Patent by those models. *See Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (holding that an injunction may prohibit "infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices"). Such an injunction would not prohibit Holland from selling non-infringing products under different model numbers.

Therefore, Holland's arguments do not tip the balance of hardships analysis in its favor. PCT has shown that the balance of hardships weighs in PCT's favor.

### E.    Public Interest

The final factor is whether the public interest would not be disserved by an injunction. Here, the relevant portion of the public is the telecommunication companies that purchase coaxial cable connectors. An immediate permanent injunction would affect Holland's ability to supply, and thus the telecommunication companies' ability to purchase, the infringing connectors. Holland's entire objection with respect to the public interest factor centers on its allegation that it has redesigned non-infringing products. (Doc. 425 at 7-8). But Holland offers only attorney argument, which is not evidence. Thus, there is no evidence that granting an injunction will suppress healthy competition, and thus no evidence of danger to the public interest.

Furthermore, PCT has the capability to absorb Holland's infringing sales. The evidence showed that PCT has sold tens of millions of its connectors embodying the '422 Patent since the year 2000. (Tr. 884:23-25). Holland has sold approximately 30 million infringing connectors between 2007 and 2015. (Tr. 1060:16-17). Thus, it appears that the volume of Holland's infringement is such that PCT could likely supply Holland's customers in the absence of Holland selling its infringing products. This weighs in favor of finding that the public interest would not be disserved. Finally, because Holland misstates the test, (Doc. 425 at 7:11-12), the Court notes that PCT must show only that the public interest would *not be disserved* by an injunction, not that the public interest would be *served* by an injunction. PCT has shown that the public interest would not be

disserved by an injunction.

### F.    Form of the Injunction

PCT is entitled to a permanent injunction enjoining Holland from selling any of the Holland models found by the jury to infringe the '422 Patent, along with any colorable imitations of those products.[24]

In crafting an injunction appropriate to this case, the Court is mindful of the specificity requirements of Rule 65(d), which aims to reduce "unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful." *Int'l Rectifier*, 383 F.3d at 1316. Accordingly, the Court will enter an injunction that prohibits Holland from making, using, offering to sell, or selling within the United States, or importing into the United States, the sixty Holland connector models found to infringe, along with colorable imitations of those models. Pursuant to Rule 65(d)(2), the injunction will also bind Holland's agents and those in active concert or participation with Holland.

The Court anticipates that the parties will raise the issue of whether Holland may sell non-infringing products under the same sixty model numbers found at trial to infringe the '422 Patent. It may not.[25] Holland's own proposed verdict form asked the jury "[h]as PCT proven by a preponderance of the evidence that the Holland products listed below literally infringe claim 1 of the '422 patent?" (Doc. 290 at 2). Holland's proposed verdict form then lists Holland products by model number. (*Id.* at 2-4). The Court initially declined to adopt Holland's proposed verdict form, which Holland advocated on the basis that it would help the Court later decide which products to enjoin. (Tr. 2086:6-2087:1). The Court ultimately adopted Holland's proposal, and Holland has thus waived any argument that the infringement found by the jury did not include the model number as a necessary identifier of the infringing product. *Cf. Yeti by Molly, Ltd. v. Deckers Outdoor*

---

[24] Because the Court is entering a permanent injunction, the Court need not consider the parties' arguments concerning an ongoing royalty rate. *See* (Doc. 404 at 14-15; Doc. 425 at 8-10; Doc. 426 at 8-11).

[25] Holland may, however, sell redesigned products under new model numbers that indicate revised versions of its connectors. For example, a redesigned "SLCU-6" could be sold as a "SLCU-6-1."

*Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001).

**VII.    Conclusion**

Pursuant to Rule 58(a), which requires judgments to be set forth in a separate document, the Court has entered its judgment and permanent injunction in a separate document filed contemporaneously with this Order. Furthermore,

**IT IS ORDERED** granting Defendant's Motion to Supplement the Record (Doc. 396).

**IT IS FURTHER ORDERED** that Doc. 396-1 and Doc. 396-2 are true and correct copies of the documents referenced in page 2050, lines 14-15 of the trial transcript.

**IT IS FURTHER ORDERED** denying Defendant's Motion for Entry of Judgement [sic], Findings of Fact, and Conclusions of Law Regarding Laches and Equitable Estoppel (Doc. 406).

**IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment as a Matter of Law Regarding the Number of Infringing Units and Amount of Damages; (2) Infringement; (3) Invalidity for Anticipation or Obviousness; (4) Invalidity for Indefiniteness, and (5) Extraterritoriality (Doc. 408).

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiff PCT International, Inc.'s Motion for an Accounting for Royalties Due Through Entry of Judgment, Prejudgment Interest, and Postjudgment Interest" (Doc. 405).

**IT IS FURTHER ORDERED** that the parties shall meet and confer (either in-person or telephonically) within ten days from the date of this Order to agree upon an accounting of infringing units sold by Holland for the period from February 26, 2015 through the date of this Order. If the parties are unable to agree upon an accounting, then they shall jointly file, within fifteen days from the date of this Order, a schedule that provides proposed deadlines for the following: (1) Holland's production of a declaration of a witness with personal knowledge who attests to the number of infringing units imported or sold by Holland from February 26, 2015 through the date of this Order, along

with Holland's regularly maintained business records showing the numbers of such units; and (2) PCT's filing of a brief for its request of supplemental damages and any interest thereon.

**IT IS FURTHER ORDERED** granting Plaintiff International, Inc.'s Motion for Permanent Injunction (Doc. 404).

Dated this 8th day of September, 2015.

James A. Teilborg
Senior United States District Judge